IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

SHAWN W.,

     Plaintiff,

v.                                                                    CIVIL ACTION NO. 3:25-cv-00548

FRANK BISIGNANO,
Commissioner of Social Security,

     Defendant.


**PROPOSED FINDINGS & RECOMMENDATION**


Plaintiff Shawn W. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying his application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before this Court are Claimant's Brief (ECF No. 11) and the Commissioner's Brief (ECF No. 12). Having fully considered the record and the parties' arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF

No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was forty-eight years old at the time of his alleged disability onset date and fifty-one years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 41, 232).[1] He has a high school education, and past relevant work experience as a customer-service employee at a convenience store and as a home-health aide. (ECF No. 11 at 11). Claimant alleges that he became disabled on June 1, 2022, due to the following physical impairments: rheumatoid arthritis; leg pain; bilateral knee pain; falls; inability to bear any weight on his lower extremities bilaterally due to pain; degenerative disc disease of the lumbar spine; multilevel facet arthropathy; multiple thyroid nodules; hypothyroidism; high blood pressure; anemia; chronic venous insufficiency; inflammatory poly arthropathy; high cholesterol; osteoarthritis; asthma; anemia; chronic fatigue; and arthralgias. (Tr. 17, 90).

Claimant filed his application for Title II benefits (the "claim") on July 11, 2022. (ECF No. 11 at 1). The Social Security Administration (the "Agency") denied the claim initially on March 15, 2023, and again upon reconsideration on December 21, 2023. *Id*. Thereafter, on January 2, 2024, Claimant filed a written request for hearing. *Id*. An administrative hearing was held before an ALJ on August 13, 2024. *Id*. Subsequently on September 13, 2024, the ALJ entered an unfavorable decision. *Id*. Claimant then sought

---

[1] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 9.

review of the ALJ's decision by the Appeals Council. Ultimately the Appeals Council denied Claimant's request for review on October 2, 2024, and the ALJ's decision became the final decision of the Commissioner on that date. *Id.* at 1-2.

Claimant brought the present action on September 11, 2025, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on November 20, 2025. (ECF No. 9). Claimant subsequently filed his Brief on December 22, 2025. (ECF No. 11). In response, the Commissioner filed his Brief on January 14, 2026. (ECF No. 12). Claimant has not filed a Reply, and the time to do so has elapsed. *See* Rule 8, Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). Accordingly, this matter is now ripe for adjudication.

## B. Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the medical evidence, and summarizes the relevant portions here for the convenience of the United States District Judge.

### i. Treatment Records

**Physical Treatment**

Claimant presented to Dr. Matthew Samuel, M.D., in Huntington, West Virginia, on June 13, 2022, on referral "for evaluation of possible rheumatoid arthritis." (Tr. 389). Claimant reported "having constant pain and swelling of feet, knees and hands" over the previous three years. *Id.* Claimant reported he received an injection in the knees "without any relief." *Id.* Further, his symptoms were worsening, and he "developed deformity of the hand joints a few months ago." *Id.* With respect to specific symptoms, Claimant reported hoarseness, dyspnea, "localized soft-tissue swelling (nonjoint), pain localized to

one or more joints, and joint swelling localized to one or more joints[,]" as well as decreased taste, bilateral anosmia, anemia, and high blood pressure. (Tr. 391). Claimant reported "not feeling restless, no anxiety, [and] no depression," and on examination he was found to be oriented to time place, and person, with unimpaired memory and judgment; his mood "was not anxious, was not depressed, and was not euphoric" and "[t]he affect was normal and insight was intact." (Tr. 392-92). Further, on examination Claimant was noted to require an assistive device to ambulate but his gait, stance, and deep tendon reflexes were normal. (Tr. 392). However, "[e]xamination of the shoulders, elbows, hips, knees and ankles showed tenderness with a limitation of movement of both shoulders, flexion deformity [of] both elbows and tenderness with minimal crepitation [in the] knees." *Id.* Further, examination of the Claimant's wrist and finger joints "showed tenderness with moderate synovitis and limitation of movement of both wrists, advanced swan-neck deformity of both hands with incomplete fist and grip" as well as "moderate synovitis" of the joints in Claimant's fingers." (Tr. 393). Examination of the joints in Claimant's feet and toes "showed tenderness [in] both feet . . . with early deformity of both feet [and] toes." *Id.* Dr. Samuel assessed generalized osteoarthritis, rheumatoid arthritis of multiple sites; inflammatory polyarthropathy; and arthralgias of multiple sites. *Id.* Dr. Samuel "discussed . . . [the] [c]omplex and chronic nature" of the diagnoses, and "told the patient that based on the history and examination in [his] opinion we are dealing with advanced rheumatoid arthritis which has already given rise to deformity of hand joints." (Tr. 393-94). Dr. Samuel explained to Claimant that he had a "very poor prognosis" due to the "[a]dvanced nature of his clinical presentation with deformity of multiple joints[.]" (Tr. 393). He informed Claimant "that our aim is to confirm the diagnosis and start him on aggressive treatment to prevent further joint destruction." (Tr. 394). Finally, Dr.

4

Samuel prescribed steroid medication, ordered a laboratory workup including screening for viral diseases, and ordered x-rays of the joints. (Tr. 393-94).

Claimant underwent medical imaging of his left hand on June 23, 2022. (Tr. 562). The impression suggested inflammatory arthropathy based upon osteopenia; marginal erosions seen in the metacarpophalangeal joints and proximal interphalangeal joints; marked narrowing of the radiocarpal joint; irregularity of the distal ulna; and periarticular soft tissue swelling. *Id.*

Claimant followed up with Dr. Samuel on July 20, 2022 "for re-evaluation and medication management." (Tr. 377). Claimant denied "any new or worsening rheumatology symptoms" since the last visit, and Dr. Samuel found that Claimant "has been following our recommended treatment plan with good improvement." *Id.* Dr. Samuel assessed generalized osteoarthritis, rheumatoid arthritis that was "strongly positive rheumatoid factor" of multiple sites without involvement of other organs and symptoms," and arthralgias of multiple sites. (Tr. 381). Dr. Samuel started treatment for rheumatoid arthritis and added methotrexate, with a plan to taper off the prednisone. *Id.*

Claimant followed up with Dr. Samuel on September 29, 2022 "for re-evaluation and medication management." (Tr. 525-30). His findings were largely the same as the July 20, 2022 examination. *See id.* Dr. Samuel noted that since Claimant was "clinically stable" he would continue the current dose of methotrexate and begin to taper Claimant off of the prednisone. (Tr. 529). Dr. Samuel explained to Claimant that he would be leaving his practice "soon," and discussed referring Claimant to another rheumatologist for care. *Id.*

On December 5, 2022, Claimant presented to Ralph W. Webb, M.D., with Marshall Internal Medicine Rheumatology in Huntington, West Virginia, on referral from Dr.

Samuel. (Tr. 643-44). Claimant reported that he "is 40% better" on the medication regimen prescribed by Dr. Samuel, but that "he continue[d] to have significant joint pain to the extent that he is unable to work his previous job as a cashier." (Tr. 643). Claimant also reported that the methotrexate medication was causing nausea. *Id.* On examination, Dr. Webb found synovial thickening in the joints of Claimant's knuckles, and noted that several fingers have mild swan-neck deformities; additionally, Claimant had a diminished grip; pain elicited with passive range-of-motion of the shoulders, elbows, hips, and knees; 20 degree extension deficit in the left elbow; 10 degree extension deficit in the right elbow; mild warmth in the knees with no effusion; and slightly warm, tender ankles. (Tr. 644). He assessed seropositive rheumatoid arthritis and osteoarthritis. *Id.* The treatment plan called for increasing Claimant's methotrexate dose and to continue tapering the steroid medication. *Id.* Additionally, an order was given for physical therapy.

On December 6, 2022, medical imaging of the right knee showed an impression of joint effusion, though there was no fracture, dislocation, or significant joint space narrowing. (Tr. 549). Imaging of the left knee showed no definite abnormality. (Tr. 550). Imaging of the right hand showed an impression of arthritic changes at multiple joints within the right hand showing arthritic joint space narrowing. (Tr. 551). Imaging of the left hand showed significant joint space narrowing with what appears to be subluxation and the second and third metacarpophalangeal joints. (Tr. 552). The impression was findings suggestive of rheumatoid arthritis. *Id.* Impression of the right foot revealed significant joint space narrowing of the right-first metatarsophalangeal joint an interphalangeal joint; further, a calcaneal spur was noted, and arthritic changes were seen in the right great toe. (Tr. 553). Impression of the left foot also showed arthritic changes in the left great toe, but with no acute bony or articular abnormality. (Tr. 554). Finally,

impression of the right elbow showed joint effusion with arthritic changes noted of the right elbow joint, while impression of the left elbow showed joint effusion with possible subtle fracture of the left radial head. (Tr. 555-56).

On March 12, 2023, Claimant presented to Cabell Huntington Hospital where he was admitted to the Clinical Observation Unit from the Emergency Room with bilateral leg pain due to knee effusions, as well as leukocytosis, elevated uric acid, hypertension, hypothyroidism, hypokalemia, and hypomagnesemia. (Tr. 566). A bilateral-knee x-ray indicated large suprapatellar joint effusion. (Tr. 567). He was placed on steroid medication after bilateral knee aspirations had negative cultures. *Id.* Additionally, he was placed on medication to address his elevated uric acid and hypothyroidism. *Id.* He was released in stable condition on March 17, 2023 with a diagnosis of rheumatoid arthritis flare, hypokalemia, and hypomagnesemia. (Tr. 568-69).

On March 13, 2023, during his admission, Claimant underwent medical imaging of the lumbar spine due to lumbar radiculopathy. (Tr. 571). The impression was no acute process, though there was degenerative disc disease at the L3-L4 vertebrae and multilevel facet arthropathy. *Id.* The findings showed moderate L3-L4 disc space narrowing with small endplate osteophytes and central disc protrusion; further, there was "at least mild if not moderate spinal canal stenosis at this level" in addition to "[m]ild facet arthrtopathy at Le-L4, L4-L5, and L5-S1." *Id.*

Claimant followed up with his rheumatologist, Dr. Webb, on May 9, 2023. (Tr. 607). Dr. Webb noted that Claimant had been admitted to observation at the hospital in March 2023 for acute bilateral knee pain, and had "-80ccs of inflammatory synovial fluid aspirated on arthrocentesis of one knee." *Id.* On his initial follow-up after his hospitalization, Claimant "described poor compliance to methotrexate secondary to

significant nausea . . . and was therefore switched to injectable methotrexate [approximately] 6 weeks ago." *Id.* Since beginning the injectable methotrexate he reported "complete resolution of nausea and has had good control of his rheumatoid symptoms." *Id.* Additionally, he was prescribed Humira. He denied any acute rheumatoid arthritis flares since his last visit and reported that he was "happy with his current regimen." *Id.* Dr. Webb recommended using a therapy hand ball for intrinsic muscle strengthening for swan-neck deformities. (Tr. 608). Claimant was continued on his present therapy and instructed to follow up in three months. *Id.*

On August 15, 2023, Claimant followed up with Dr. Webb. (Tr. 632-33). Claimant reported that he had "good control" of his joint pain at that time, and was "tolerating his injections well." (Tr. 632). Dr. Webb assessed rheumatoid arthritis, osteoarthritis, and hyperuricemia. *Id.* He continued Claimant on methotrexate and Humira and directed Claimant to return in three months. *Id.*

On November 20, 2023, Claimant followed up with Dr. Webb. (Tr. 715). Claimant reported "that his symptoms have been well managed since his last visit," and he denied "any acute flares" though he did report experiencing "some increased stiffness since the weather has been changing however he has been able to wear gloves and apply heat with relief." *Id.* On examination, Dr. Webb found no inflammatory synovitis; there was normal range of motion; there was chronic synovial thickening bilaterally in the knuckles; and there were swan-neck deformities to several fingers bilaterally. *Id.* Dr. Webb continued Claimant on his current therapy, ordered "[r]outine surveillance labs" and directed Claimant to return in three months. (Tr. 716).

On February 19, 2024, Claimant followed up with Dr. Webb's office, where he was seen by Dr. Andrew Murphy, M.D. (Tr. 797-98). Claimant reported "no change in

symptoms over the past 3 months, but that he has had increased morning pain and stiffness most prominent about the left knee, lower back and bilateral hands most prominent at the [metacarpophalangeal] MCP joints." (Tr. 797). Claimant also reported that prolonged standing and sitting increased his pain; however, he denied having any acute flares. *Id.* On examination, Dr. Murphy found no active inflammatory synovitis; there was chronic synovial thickening bilaterally of the MCP joints as well as the proximal interphalangeal ("PIP") joints. *Id.* Additionally, there was tenderness throughout the MCP joints bilaterally, with no appreciable erythema or significant swelling. There were swan-neck deformities to multiple fingers bilaterally, as well as stiffness at the MCP and PIP joints making a full composite fist. (Tr. 797-98). There was effusion of the left knee with mild tenderness diffuse throughout the knee, and significant pain elicited with attempted terminal extension both actively and passively. (Tr. 798). Dr. Murphy assessed seropositive rheumatoid arthritis, osteoarthritis, and hyperuricemia. *Id.* Dr. Murphy recommended addition of Meloxicam to his prescription medication regiment, "as his symptoms appear more mechanical in nature than acute rheumatologic flares." *Id.* Claimant was otherwise continued on his current medications and directed to follow up in three months. *Id.*

Finally, Claimant followed up with Dr. Webb on April 29, 2024. (Tr. 819). Claimant reported that he was "doing relatively well at this time" and that he "tends to [be] better when the weather gets warmer." *Id.* He denied "any acute flares of joint swelling, warmth or redness since his last visit 3 months ago." *Id.* Further, Claimant reported that his "activities of daily living remained intact." *Id.* On examination, Claimant was noted to be a "[p]leasant adult male resting comfortably" with "no active boggy synovitis appreciated in the peripheral joints." *Id.* There were "mild swan neck deformities in several fingers"

9

as well as a 30-degree extension deficit in the left elbow and a 25-degree extension deficit in the right elbow. *Id.* There was good shoulder abduction and rotation, slightly-limited knee extension, and normal gait and station. *Id.*

### **Mental-Health Treatment**

With respect to Claimant's Mental-Health Treatment, on March 29, 2023, Claimant presented to Nurse Practitioner Julie Sturgill, APRN, CNP, with Family Medicine Clinic in Kenova, West Virginia, to establish care and for complaints of depressed mood and anxiety. (Tr. 592). He complained of feeling down, depressed, and having more anxiety, and reported feeling overwhelmed with finances after being "denied disability[.]" (Tr. 592). He reported a history of anxiety and depression but stated that he had never been treated and had no prior hospitalizations related to anxiety or depression. *Id.* Nurse Sturgill assessed mixed anxiety and depressive disorder. (Tr. 593). She started Claimant on Sertraline (Zoloft) and recommended he follow up in one month. *Id.*

On April 26, 2023, Claimant followed up with Nurse Sturgill regarding his anxiety. Treatment notes indicate that Claimant was tolerating the Sertraline medication well. (Tr. 599). Claimant reported that he was "sleeping much better" although he was experiencing some crying spells. (Tr. 599-600). In general, however, he reported that his mood had improved and he was "feeling much better" with no other questions or concerns. (Tr. 600). Nurse Sturgill increased Claimant's prescription and recommended he return in six months. *Id.*

On February 14, 2024, Claimant presented to Dr. Danny Frame, Psy.D., with Marshall Psychiatry and Behavioral Medicine in Huntington, West Virginia, for an initial psychological assessment on referral from his general practitioner. (Tr. 892-94). Claimant reported that he had not received mental-health treatment in the past. Claimant

reported that his medical issues of rheumatoid arthritis and osteoarthritis "brought some depressive symptoms" and pushed him toward seeking therapy. (Tr. 892). He reported symptoms of depression and anxiety including psychomotor retardation, depressed mood, fatigue, anhedonia, feelings of worthlessness and guilt, significant weight change, concentration problems, sleep disturbances, irritability, restlessness, and muscle tension. (Tr. 893). His mental-status examination results showed mild distress; anxious behavior; normal speech; congruent mood; depressed and anxious affect; logical and goal-directed thought process; good judgment; and intact memory and education. (Tr. 894). Dr. Frame assessed "major depressive disorder, recurrent episode, moderate with anxious distress" on the grounds that Claimant was "exhibiting symptoms related to depression over an extended period of time, with mixed symptoms of anxiety related most often to his health and functioning. *Id.* The treatment plan was to "begin working on [cognitive behavioral therapy] CBT based therapy techniques to help moderate symptoms of depression." *Id.* Over the next five months, Claimant presented to Dr. Frame's office for therapy twice monthly. (Tr. 864-91).

On April 29, 2024, Claimant followed up with Nurse Sturgill. (Tr. 852). Claimant reported trouble sleeping. (Tr. 853). On examination, Claimant was not in any acute distress and was noted to have a normal mood and affect. *Id.* Nurse Sturgill found that his depression was stable and continued him on his Sertraline medication. (Tr. 854). She also prescribed him Trazodone to aid with sleep. *Id.*

On May 29, 2024, Claimant presented to Nurse Sturgill for a one-month follow-up after starting Trazodone for insomnia. (Tr. 836-40). Claimant reported that it was "working great" and that he was "pleased with his current dose" and "sleeping well with

11

this." (Tr. 840). His depression screen had a score of zero, with anormal mood and affect and no other symptoms. (Tr. 840-41). Claimant was continued on Trazodone. (Tr. 841).

On July 11, 2024, Claimant presented for another therapy appointment at Marshall Psychiatry. (Tr. 862). Claimant reported "that since the prior session things had been going well as he had recently returned from a vacation to visit friends." *Id*. He did note that "his anxiety had been higher, but attributed this to the temperature outside influencing his mood[.]" *Id*. His mental-status examination results showed mild distress; calm, cooperative behavior; normal speech; appropriate mood; congruent affect; logical thought process; good judgment; intact memory; and no delusions, hallucinations, or suicidal ideation. (Tr. 862-63). He was assessed with major depressive disorder, recurrent episode, moderate with anxious distress. *Id*. The treatment plan was to "continue working on [cognitive behavioral therapy] CBT based therapy techniques to help moderate symptoms of depression." (Tr. 863).

### ii.    Claimant's Hearing Testimony

At the August 13, 2024 hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 47-56). Claimant testified that he most recently worked as a manager and an attendant at a gas station convenience store. (Tr. 47). In that role, he was required to lift up to 175 pounds on a daily basis and was on his feet most of the time. *Id*. Claimant also has previous work experience as a home health aide. (Tr. 49). That role also required lifting individuals weighing up to 250 pounds, and required Claimant to be on his feet most of the day. (Tr. 50).

With respect to his physical impairments, Claimant testified that his hypertension is controlled with medicine. (Tr. 52). However, his osteoarthritis and rheumatoid arthritis caused pain as well as swelling in his knees, ankles, shoulders, elbows, and hips. (Tr. 50-

51). Additionally, his degenerative disc disease in the lower lumbar area of the spine also cause him pain—particularly when he tries to stand up. (Tr. 50-51). Chronic venous insufficiency also causes pain and constant swelling in his legs. (Tr. 51-52). Claimant testified that the pain from these conditions affect his daily living activities, making it difficult to clean his house. (Tr. 54).

With respect to his mental health, Claimant testified that he has been diagnosed with depression and takes Zoloft for that. (Tr. 52-53). He had experienced depression over the previous five years, and it affected his ability to eat, his ability to sleep at night, and his concentration/memory. (Tr. 53-54). Claimant testified that his depression also diminished his interest in activities; as a result, he does not often leave the house and prefers to stay in bed. (Tr. 54). He testified that his medication makes him drowsy causing him to "lay down at least 80% of the day." (Tr. 55-56).

### iii.    Vocational Expert Testimony

At the August 13, 2024 administrative hearing, the ALJ employed a vocational expert (the "VE") to aid in determining whether Claimant could perform his past relevant work, or other work. (Tr. 56-60). The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified that Claimant worked as a convenience-store clerk. (Tr. 56). This clerk position had a specific vocational preparation ("SVP") of two and is at a light level of exertion as generally performed, but a medium level of exertion as actually performed by Claimant. (Tr. 56-57).

The ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant and was capable of performing work at the light or sedentary exertional level, with some additional limitations, as follows:

> [The individual could perform] no more than occasional climbing of ramps and stairs, stooping or crawling, no climbing ladders or scaffolds, no more than frequent balancing, kneeling, or crouching, no more than frequent hand fingering bilaterally, and finally, no concentrated exposure to temperature extremes, wetness, humidity, vibration, or hazards.

(Tr. 57). The VE opined that such a hypothetical individual could perform work at both the light and sedentary levels, including the representative occupations of (1) retail marker, a light position with approximately 150,000 jobs in the national economy (2) photocopying machine operator, a light position with approximately 6,000 jobs; (3) document preparer, a sedentary position with approximately 12,000 jobs; and (4) addressor, a sedentary position with approximately 2,000 jobs. *Id.* Each of the representative occupations listed by the VE had an SVP of two. *See id.*

In response to questioning from Claimant's counsel, the VE testified that Claimant would be precluded from all work if he were limited to lifting less than fifty pounds, standing and/or walking less than two hours in an eight-hour workday, sitting for three hours maximum, with the need to change positions every sixty minutes. (Tr. 58). Next, in response to questioning from Claimant's counsel, the VE testified that all work would be precluded if there were a moderate limitation in the ability to work in coordination with the proximity of others without being distracted from them, a moderate limited ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without unreasonable interruptions and rest periods, as well as a moderate limitation in the ability to interact appropriately with the general public. (Tr. 58-59).

### iv.    Consultative Evaluations

On August 30, 2022, Freddie Vaughan, M.D., Claimant's Family Medicine physician, completed a "FMLA leave" form on behalf of Claimant. (Tr. 518). Dr. Vaughan

14

opined that Claimant's disabling condition was "lifelong" and that he had permanent or long term conditions requiring multiple treatments, and his pain interfered with work activities. (Tr. 518-19). Dr. Vaughan further opined that Claimant's period of incapacity began on June 25, 2022, and was continuing "until treatment maximized" at an unknown point. *See id.* Finally, Dr. Vaughan opined that, due to his disabling condition, Claimant was not able to stand for an extended period of time or to use a register or keyboard. (Tr. 519-20).

On January 30, 2024, Claimant presented for a Residual Functional Capacity Evaluation by Dr. Ralph Webb, M.D., of Marshall Internal Medicine Rheumatology. (ECF No. 11 at 6). Dr. Webb's diagnosis was rheumatoid arthritis, osteoarthritis, and secondary digital deformities. *Id.* (citing Tr. 795). Dr. Webb opined that Claimant can occasionally lift/carry less than ten pounds; can stand and/or walk for up to three hours; can sit for up to three hours; should alternate sitting/standing once every 60 minutes; and was limited in his ability to push and/or pull in the upper extremities. *Id.* Additionally, Dr. Webb opined that Claimant can never climb ramps, stairs, ladders, ropes, or scaffolds; can never stoop, kneel, crouch, or crawl; and can occasionally balance. *Id.* Further, Dr. Webb opined that Claimant was limited in reaching in all directions, including handling, fingering, and feeling. *Id.* at 7. Lastly, Dr. Webb opined that Claimant must avoid wetness, vibration, fumes, and odors; must avoid extreme cold, heat, humidity, and all other hazards; and had limited ability to operate machinery or climb due to a limited range of motion. *Id.*

Later on June 6, 2024, Dr. Webb completed a Disability Incapacity Medical Assessment form. (*See* ECF No. 11 at 7) (citing Tr. 861). Dr. Webb assessed rheumatoid arthritis with a poor prognosis, expected to last indefinitely/permanent. *Id.* Dr. Webb opined that Claimant cannot sit, stand, or bend for more than thirty minutes; cannot

15

lift/carry or move objects more than five pounds; and cannot sit for a duration exceeding thirty minutes. *Id.* Dr. Webb further opined that there were no accommodations available for Claimant's condition; that he could not comfortably sit through or participate in daily activities, and that he was unable to participate in a work activity or educational activity at least five hours per week with accommodations. *Id.*

On July 26, 2024, Daniel Frame, Psy.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 896). Dr. Frame assessed "Major Depressive Disorder, recurrent episode, moderate with anxious distress" as well as "Generalized Anxiety Disorder." *Id.* He opined that Claimant had no significant limitations in understanding and memory; moderate limitations in sustained concentration and persistence; moderate limitations in social interaction; and no significant limitations in the ability to adapt or manage oneself. (Tr. 896-97). He also opined that Claimant would be absent from work approximately four times per month due to weekly therapy. *Id.*

### v.    Administrative Findings

In March 2023, state-agency physician Palle Reddy, M.D., reviewed the record and opined that Claimant could perform light work, with the following exceptions: he could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop and crawl; could frequently balance, kneel, and crouch; could frequently perform handling and fingering; and must avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibration, and hazards. (Tr. 85-87). In December 2023, state-agency physician Narendra Parikshak, M.D., independently reviewed the updated record and concurred with Dr. Reddy's opinion. (Tr. 96-98).

With respect to Claimant's mental impairments, in December 2023, state-agency psychologist Timothy Saar, Ph.D., reviewed the record on reconsideration and opined that Claimant did not have a severe mental impairment. (Tr. 94-95).

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence.

17

*See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "[his] ability to perform work despite [his] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable

impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements of the Social Security Act through December 31, 2027. (ECF No. 11 at 2). He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. *Id.* Next,

19

the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: (1) rheumatoid arthritis; (2) osteoarthritis; (3) thyroid disorder; (4) hypertension; (5) depression; and (6) anxiety. *Id.* Next, the ALJ found that Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Next, assessing Claimant's RFC, the ALJ determined that Claimant has the ability to perform "light" work as defined in 20 C.F.R. 404.1567(b), with the following additional limitations:

> The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. He can occasionally stoop and crawl, and frequently balance, kneel, and crouch. He can frequently handle and finger bilaterally. The claimant is unable to perform work requiring concentrated exposure to temperature extremes, wetness, humidity, vibration, and hazards, such as unprotected heights and moving mechanical parts.

(ECF No. 11 at 2).

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform any past relevant work. *Id.* He noted that Claimant was "a younger individual" on the alleged disability onset date with "at least a high school education" and that "[t]ransferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled." *Id.* The ALJ found that, considering the Claimant's age, education, work experience, and RFC, "the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." *Id.* Based upon the testimony of the Vocational Expert, the ALJ found that Claimant could perform the representative occupations of (1) retail marker—an unskilled job at the "light" level of exertion; (2) photocopy machine operator—an unskilled, light job; (3) document preparer, an unskilled, sedentary job; and

20

(4) addressor, an unskilled, sedentary job. As a result, the ALJ concluded that Claimant was not disabled/under a disability during the relevant time period, and the claim for benefits was denied. *Id.*

## II. LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III. DISCUSSION

### A. Development of the Medical Evidence

Claimant first asserts that the ALJ "failed in his duty to fully develop medical evidence regarding [Claimant's] multiple medical conditions[.]" (ECF No. 11 at 10).

21

Claimant asserts that the ALJ failed to develop medical evidence with respect to a number of his impairments, "including but not limited to" the following: 1) Rheumatoid arthritis 2) arthralgia multiple joints 3) bilateral knee pain 4) L3-4 degenerative disc disease 5) thyroid, multiple nodules; hypothyroidism 6) high blood pressure 7) anemia 8) chronic venous sufficiency 9) inflammatory poly arthropathy 10) osteoarthritis 11) asthma 12) depression; and 13) chronic fatigue. *Id.* Without elaborating in any meaningful way, Claimant makes the conclusory argument that "the ALJ failed to fully develop the RFC of his treating doctor on his physical limitations." *Id.* Claimant states his disagreement with the ALJ, asserting that he "is unable to engage in Substantial Gainful Activity." *Id.* In support, he points to evidence in the record such as his testimony. *Id.* at 11-12.

The Fourth Circuit has explained that an ALJ has a "responsibility to help develop the evidence." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Specifically, the ALJ must "explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant *when that evidence is inadequate.*" *Id.* (emphasis added). Nevertheless, it is the Claimant's ultimate burden to prove to the Commissioner that he or she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). *See also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("The claimant must first bear the burden . . . of showing that [she] . . . has a medically severe impairment or combination of impairments[.]"); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981) (explaining that the claimant bears the burden of establishing a *prima facie* entitlement to benefits). The ALJ's duty to develop the record does not compel the ALJ to seek additional evidence if the record allows him to make a fair decision. *Tara R. v. Comm'r of Soc. Sec. Admin.*, 6:24-cv-6516, 2026 WL 585826, at *2 (D.S.C. Mar. 2, 2026).

Moreover, although the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, the ALJ "is not required to function as the claimant's substitute counsel[.]" *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table opinion). Where, as in the instant matter, the Claimant was represented by counsel, the ALJ "has the right to assume that [Claimant's] counsel was presenting the strongest case for benefits." *Id.* Thus, "[a]n ALJ's duty to develop the record does not require him to make specific inquiries into the [Claimant's] treatment modalities or search for cumulative evidence; his duty is to obtain sufficient evidence upon which [s]he can render an informed decision." *Id. See also Perry v. Astrue*, 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D. W. Va. Oct. 20, 2011) (explaining that the ALJ's duty to develop the record "does not permit a claimant, through counsel, to rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation").

An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Frank L. v. Bisignano*, 3:25-cv-146, 2025 WL 3618868, at *5 (S.D. W. Va. Nov. 25, 2025), *adopted*, 2025 WL 3618309 (S.D. W. Va. Dec. 12, 2025). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Id.* (citing *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). Pursuant to this standard, remand is necessary only "if the record has evidentiary gaps that result in unfairness or clear prejudice." *Carol P. v. O'Malley*, 23-cv-750, 2024 WL 415363, at *3 (D. Md. Feb. 2, 2024).

23

With respect to Claimant's assertion that the ALJ failed to develop the evidence concerning his numerous impairments, it is noted that Claimant does not specify what evidence was inadequately fleshed out by the ALJ. He does not explain what he believes the ALJ should have done; nor does Claimant make any particular argument regarding the ALJ's decision. Rather, he simply recites from portions of his medical treatment notes. This falls far short of Claimant's burden to demonstrate an evidentiary gap that results in unfairness or clear prejudice. While Claimant sets forth a list of evidence that he feels supports his claim, it is the ALJ's role to weigh the evidence, not the Court's; it is of no moment that the Court may have drawn different conclusions from the evidence, because that is not the standard on review in a § 405(g) matter. *Craig*, 76 F.3d at 589. This Court has repeatedly rejected such undeveloped arguments. *See Shawn S. v. Bisignano*, 2:25-cv-00326, 2025 WL 2952798, at *11 (S.D. W. Va. Sept. 22, 2025), *adopted*, 2025 WL 2963880 (S.D. W. Va. Oct. 17, 2025). As the Court explained in *Shawn S.*:

> [Claimant] does not identify any gaps in the record or further evidence that the ALJ should have developed. She cites a legal standard and does not articulate how it applies to her case. [Claimant's] conclusory assertion that the ALJ failed to develop the record does not assert a viable challenge to the Commissioner's decision. Indeed, the Court should not be tasked with researching and constructing [Claimant's] arguments for her. [Claimant] fails to specify any deficiencies in the record ... [Claimant] does not identify any further inquiries that the ALJ should have made or indicate what further evidence was necessary for the ALJ to render a decision on her disability applications. *[Claimant] lists pieces of medical evidence in her brief, yet she does not explain how any of it prompted further investigation.*

*Id.*

Here, just as in *Shawn S.*, Claimant's Brief merely lists pieces of medical evidence without explaining how any of it prompted further investigation. This is fundamentally inadequate. A mere diagnosis does not establish disability, because there must be a

24

showing of related functional loss. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam). Over the course of nineteen single-spaced pages, the ALJ's thorough written decision specifically identified and evaluated the relevant evidence that contrasted a lack of functional limitations against the mere diagnoses to which Claimant points. At the hearing before the ALJ, Claimant's counsel affirmed he had no objections to the exhibits in the record and did not request that the ALJ hold the record open to obtain additional records. (Tr. 44, 60). Nothing in the record indicates any evidentiary gaps resulting in unfairness or clear prejudice. While Claimant may disagree with the ALJ's determination, that is not a valid basis for remand. The ALJ's thorough decision reflects a full consideration of the record and provides substantial evidentiary support for his determination that Claimant retained the functional capacity to perform a narrow range of light work. (*See* Tr. 17-35). Simply put, the ALJ's decision is supported by substantial evidence, and Claimant has failed to demonstrate error.

### B.      Claimant's Combination of Impairments

Lastly, Claimant asserts that remand is proper because "the combined effects of his physical and mental impairments were not properly considered and evaluated by the ALJ," as the ALJ "failed to consider the medical records of [Claimant's] longtime treating physicians[.]" (ECF No. 11 at 16).

Claimant bears the burden of proving that he has an impairment or combination of impairments that meets or medically equals the severity of one of the Commissioner's listed impairments. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). Here, Plaintiff has not identified which particular listing he believes his combination of impairments meets or medically equals (*see* ECF No. 11 at 14-16). Nor has he pointed to any specific evidence to support his conclusory assertion. Claimant's conclusory assertion that his

multiple impairments, when combined, are totally disabling, "fails to assert a specific challenge to the Commissioner's decision." *Roger W. v. Colvin*, 3:24-cv-129, 2024 WL 5329920, at *7 (S.D. W. Va. Dec. 30, 2024), *adopted*, 2025 WL 104549 (S.D. W. Va. Jan. 15, 2025) (finding that a claimant "effectively waived this challenge by raising it only in a conclusory fashion").

Contrary to Claimant's argument, the ALJ in this case stated at step three that Claimant "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 23). Throughout his opinion, the ALJ articulated his findings in great detail and explained the evidentiary basis for his determination. The decision documents the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, do not preclude him from engaging in substantial gainful activity. The ALJ properly discussed the opinions of each of Claimant's treatment providers, including Dr. Frame and Dr. Webb, and contrasted their findings with unremarkable examination findings as well as Claimant's statements that he was doing well with treatment. (*See* Tr. 30-32). He explained that Dr. Vaughn did not offer an opinion as to Claimant's functional limitations, and that therefore his opinion was neither valuable nor persuasive. (Tr. 32). The ALJ pointed to the prior administrative findings stating Claimant could perform a range of light work and did not have a severe mental impairment, and explained that such findings were persuasive because they were supported with citations to the evidence and consistent with the record. (Tr. 30). The ALJ's discussion of Claimant's treatment records as well as his statements to Claimant's treating providers demonstrates that he considered the full relevant record.

To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration was unnecessary

26

because the required analysis clearly took place. *See Roger W.*, 2024 WL 5329920, at \*7. Therefore, the undersigned **FINDS** that the ALJ complied with his duty to consider Claimant's impairments in combination at step three of the sequential evaluation process. As the ALJ's decision is supported by substantial evidence and free of error, remand is improper.

## IV.     RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:    April 10, 2026

Dwane L. Tinsley
United States Magistrate Judge

28